DISTRICT COURT, CITY AND COUNTY OF DENVER
COLORADO
1437 Bannock Street, Denver, CO 80202
_____

STATE OF COLORADO, *ex rel.* PHILIP J. WEISER,
ATTORNEY GENERAL

Plaintiff,

v.

E. I. DU PONT DE NEMOURS AND COMPANY; THE
CHEMOURS COMPANY; THE CHEMOURS
COMPANY FC, LLC; DOWDUPONT, INC.; CORTEVA,
INC.; DUPONT DE NEMOURS, INC.; TYCO FIRE
PRODUCTS, LP; CHEMGUARD, INC.; WILLFIRE HC
LLC, NATIONAL FOAM, INC.; ANGUS FIRE
ARMOUR CORPORATION; ANGUS INTERNATIONAL
SAFETY GROUP, LTD; BUCKEYE FIRE EQUIPMENT
COMPANY; ROYAL CHEMICAL COMPANY; and FIRE
SERVICES PLUS, INC.

Defendants.

| | |
|---|---|
| | DATE FILED: February 28, 2022 9:16 AM<br>FILING ID: 40D44739630B0<br>CASE NUMBER: 2022CV30552 |

▲ COURT USE ONLY ▲

PHILIP J. WEISER, Attorney General
AMY BEATIE, Atty Reg. No. 32351*
Deputy Attorney General Natural Resources and
Environment
LESLIE EATON, Atty Reg. No. 17791*
HEATHER KELLY, Atty Reg. No. 36052*
DAVID KREUTZER, Atty Reg. No.18873*
CARRIE NOTEBOOM, Atty Reg. No. 52910*
First Assistant Attorneys General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone: (720) 508-6000
FAX: (720) 508-6040
amy.beatie@coag.gov
leslie.eaton@coag.gov
heather.kelly@coag.gov
david.kreutzer@coag.gov
carrie.noteboom@coag.gov

Case No.

Div.:

| *Counsel of Record | |
|---|---|
| **COMPLAINT** | |

Plaintiff, the State of Colorado, upon relation of Philip J. Weiser, Attorney General for the State of Colorado, in his *parens patriae* capacity, alleges the following Complaint against Defendants. The State of Colorado demands a jury trial on all claims so triable.

## STATEMENT OF THE CASE

1.      The State of Colorado brings this action against Defendants for damages and injuries to the public health of the people of Colorado, to the property of the State of Colorado, and to the natural resources of the State of Colorado caused by the releases of toxic PFAS chemicals (as defined in Paragraph 6 below) from the transport, storage, use, handling, release, spills and/or disposal of Defendants' aqueous film forming foam ("AFFF") products in Colorado.

2.      The State of Colorado is renowned for its natural beauty. Colorado is famous for its pristine lakes and rivers, majestic mountains, and is home to enthusiastic outdoor adventurers. The State's diverse geography includes high plains, mesas, canyons, plateaus, rivers, and desert lands. The quality of life for citizens of Colorado and visitors is intrinsically tied to the State's rich array of natural resources. Coloradans value every aspect of the State's unique environment, including its fish, wildlife, and plant life.

3.      The contamination of groundwater and surface water, fish, and other natural resources from the use or disposal of AFFF has damaged the State's property and injured citizens throughout the State. The State has an interest in ensuring that groundwater, surface water, fish, and other natural resources can be safely used and enjoyed by its citizens, that the health and well-being of its citizens is not harmed by such use, and that Colorado's precious natural resources are restored and protected from widespread contamination and injury caused by the use or disposal of AFFF.

4.      AFFF is a product used to fight fuel and other flammable liquid fires. When AFFF concentrate is mixed with water a foam solution is formed. When the foam is sprayed onto fire it produces an aqueous film that blocks the fire's supply of oxygen, creates a cooling effect and an evaporation barrier, and prevents re-ignition.

5.      Defendants designed, manufactured, marketed, sold, and/or distributed AFFF throughout the United States, including for use in Colorado.

2

6.     AFFF is manufactured with the following synthetic per- and polyfluoroalkyl substances: perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorononanoic acid ("PFNA"), perfluorohexanesulfonic acid ("PFHxS"), perfluorohexanoic acid ("PFHxA"), and/or perfluoroheptanoic acid ("PFHpA") and their precursors. As used in this Complaint, the terms PFOS, PFOA, PFNA, PFHxS, PFHxA, and PFHpA include those chemicals themselves (including all of their salts, ionic states, and acid forms of the molecules) and the "precursor" chemicals that break down into these six pollutants, all of which are collectively referred to in this Complaint as "PFAS."

7.     PFAS are a family of human-made chemicals with over 5,000 compounds that have been used for decades in AFFF and in products like food packaging, carpets, non-stick products, other household items, and medical supplies because they resist heat, oil, stains, grease, and water. PFAS have been detected across the United States, including Colorado.

8.     PFAS are known as "forever" chemicals because they persist in the environment for a very long and indefinite time. PFAS are mobile, bioaccumulate in humans and animals (particularly fish), and biomagnify up the food chain.

9.     PFAS are associated with a wide array of harmful health effects. Research indicates that exposure to high levels of certain PFAS chemicals may: increase cholesterol levels; cause liver damage or changes in liver function; decrease how well the body responds to vaccines; increase the risk of serious conditions like high blood pressure or preeclampsia in pregnant women; lower infant birth weights; and be associated with a higher risk of kidney or testicular cancer.

10.     Studies show that firefighters, with heightened exposure to AFFF, have higher levels of these chemicals in their bodies than the general public. A study of female firefighters published in the journal Environmental Science & Technology found that those who were exposed to AFFF in the past year had higher concentrations of PFAS in their blood than those who were not.

11.     Defendants' PFAS-containing AFFF entered into the stream of commerce in Colorado and has been used for decades in the State by Federal, State, municipal, and other fire departments and agencies, businesses, and other entities.

12.     AFFF is commonly used and stored at chemical plants, flammable liquid storage and processing facilities, airports, HAZMAT facilities, military facilities, fire training facilities, local fire departments, and oil and gas production facilities. Colorado citizens living near these types of facilities have been and

3

continue to be exposed to PFAS, and many fear that their drinking water is unfit for consumption.

13.    Defendants' AFFF is a source of PFAS contamination in the State. To date, PFAS has been detected in soils, surface waters, groundwater, and other locations across the State, including sites in 50 of Colorado's 64 counties.

14.    Defendants' PFAS-containing AFFF are the direct and proximate cause of damages and injuries suffered by the State and its citizens as a result of contamination of State property, and contamination of the State's groundwater and surface water, fish, and other natural resources.

## **THE PARTIES**

Plaintiff – The State of Colorado

15.    Plaintiff is the State of Colorado *ex rel.* Philip J. Weiser, Attorney General (hereinafter "the State" or "Attorney General").

16.    The State brings this action in its sovereign and proprietary capacity, and as *parens patriae* on behalf of its citizens and residents to protect public health, safety, and welfare, and to protect the State's waters and environment, wildlife and wildlife habitat, and other natural resources, and to protect the State's economy.

17.    The Attorney General is authorized to bring this action in his *parens patriae* capacity, as Colorado has a quasi-sovereign interest in the health and well-being, physically and economically, of its citizens.

18.    The Attorney General is authorized to bring the common law claims asserted against Defendants in this Complaint in his *parens patriae* capacity.

19.    As a "creditor" under § 38-8-102(5), C.R.S., of the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), the Attorney General is authorized to bring this action seeking relief under CUFTA, § 38-8-108 and 109, C.R.S. (2019).

DuPont Defendants

20.    Defendant E.I. du Pont de Nemours and Company ("Historical DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Historical DuPont is a successor in interest to DuPont Chemical Solutions Enterprise.

21.     Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. The Chemours Company does business throughout the United States, including conducting business in Colorado. The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015. From April 30, 2015 until July 2015, The Chemours Company was a wholly owned subsidiary of Historical DuPont.

22.     In July 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line - which includes its fluoroproducts business - and distributed shares of The Chemours Company stock to Historical DuPont stockholders. The Chemours Company has since been an independent, publicly traded company.

23.     Defendant The Chemours Company FC, LLC is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898. The Chemours Company FC, LLC does business throughout the United States, including conducting business in Colorado. The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company and manufactures fluoropolymer resins. The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

24.     Defendant DowDuPont ("Dow Dupont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Historical DuPont merged with The Dow Chemical Company in August 2017 to create DowDuPont. Historical DuPont and The Dow Chemical Company each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since the merger, DowDuPont has completed a series of separation transactions to separate its businesses into three independent, publicly traded companies for: (a) materials; (b) science; and (c) specialty products. DowDuPont does business throughout the United States, including conducting business in Colorado.

25.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Corteva does business throughout the United States, including conducting business in Colorado. On June 1, 2019, DowDuPont separated its agriculture business by spinning it off into Corteva. Corteva was initially formed in February 2018. From February 2018 until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

26.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata

dividend. Following the June 1, 2019, stock distribution, Corteva became (and remains) the direct parent of Historical DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

27.     Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc*., i.e.*, New DuPont. New Dupont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva. New DuPont does business throughout the United States, including conducting business in Colorado.

28.     Historical DuPont, Chemours, Corteva, and New DuPont are collectively referred to as "DuPont" throughout this Complaint.

29.     DuPont manufactured and sold, distributed and/or supplied, PFAS and/or their chemical precursors to other AFFF manufacturers, including the remaining Defendants named below, for use in AFFF products that have been distributed, sold, released, supplied, transported, arranged for disposal or treatment, handled, and/or used throughout the State of Colorado causing injury to Colorado's public health, safety, welfare, natural resources, and the environment.

Remaining Defendants

30.     Defendant Tyco Fire Products, LP ("Tyco"), is a limited partnership organized and existing under the laws of the state of Delaware, with its principal place of business located at 1400 Pennbrook Parkway, Landsdale, PA 19446. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as the Ansul Company, which was organized under the laws of the state of Wisconsin ("Ansul," or collectively with Tyco, "Tyco/Ansul").

31.     Tyco acquired Ansul in 1990. Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including, but not limited to, PFOA.  Following Tyco's acquisition of Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including, but not limited to, PFOA.

32.     Defendant Chemguard, Inc., ("Chemguard") is a corporation organized and existing under the laws of the state of Texas, with its principal place of

business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard does business throughout the United States, including conducting business in Colorado.

33.     Defendant WillFire HC LLC, doing business as Williams Fire & Hazard Control ("Williams"), upon information and belief, is a Texas corporation with its principal place of business at 9605 Richard Wycoff Dr, Port Arthur, Texas 77640. Upon information and belief, Williams is a subsidiary of Chemguard.

34.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products, is a subsidiary of Angus International Safety Group, Ltd, and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire").

35.     Defendant Angus Fire Armour Corporation ("Angus Fire") is a Delaware corporation, with its principal offices at 141 Junny Road, Angier, North Carolina 27501. Upon information and belief, Angus International is the corporate parent of National Foam and Angus Fire.

36.     Defendant Angus International Safety Group, Ltd. ("Angus International") is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom LA2 7NA. Upon information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

37.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

38.     Defendant Royal Chemical Company (Royal) is corporation organized and existing under the laws of Ohio, with its principal place of business at 8679 South Freeway Drive, Macedonia, Ohio 44056.

39.     Defendant Fire Services Plus, Inc. (Fire Services Plus) is a corporation organized and existing under the laws of Georgia, with its principal place of business located at 473 Dividend Drive, Peachtree City, Georgia 30269.

40.     At all relevant times, Defendants manufactured, designed, distributed, sold, supplied, transported, arranged for disposal or treatment, and/or handled

AFFF containing PFAS that was used throughout Colorado causing injury to Colorado's public health, safety, welfare, natural resources, and the environment.

## JURISDICTION AND VENUE

41.     The State realleges and incorporates the allegations set forth in paragraphs 1 through 39 as if fully stated herein.

42.     Pursuant to § 24-31-101, C.R.S., this Court has jurisdiction over this lawsuit alleging claims for damages and injuries to the public health of the people of Colorado, to the property of the State of Colorado, and to the natural resources of the State of Colorado.

43.     The Court has jurisdiction over the Defendants under Colorado's long-arm statute, § 13-1-124(1), C.R.S., based on Defendants' transaction of business and/or tortious conduct in the State.

44.     The conduct and the violations alleged herein occurred, in part, in the City and County of Denver. Therefore, venue is proper in Denver County, Colorado, pursuant to C.R.C.P. 98.

## FACTUAL ALLEGATIONS

45.     The State realleges and incorporates the allegations set forth in paragraphs 1 through 43 as if fully stated herein.

### Defendants' PFAS-Containing AFFF Resulted in Contamination of Colorado's Property and Natural Resources

46.     Defendants manufactured and marketed PFAS-containing AFFF and sold and distributed it to the military as well as to State government entities, counties, municipalities, local fire departments and/or other governmental subdivisions, quasi-governmental entities and private entities in the State of Colorado.

47.     On information and belief, Defendants' PFAS-containing AFFF has been used, among other places in Colorado, at Peterson Air Force Base, the United States Air Force Academy Buckley Air Force Base, Fort Carson, the Suncor oil refinery, and federally regulated airports. Several of these locations are associated with PFAS contamination in the State, including sites with PFAS contamination in Adams, Denver, and El Paso counties. Defendants' PFAS-containing AFFF has also

been used by fire districts throughout the State, including locations in Boulder and Teller counties where PFAS contamination has been identified.

48.     Defendants' AFFF is a foam intended for use to extinguish high-hazard flammable liquid fires, such as jet-fuel fires, aviation-related fires, hangar fires, vehicle fires, petroleum fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

49.     Defendants' AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds. The PFAS family of chemicals are entirely human-made and do not exist in nature.

50.     When used as intended during a firefighting event or in training exercises, AFFF can result in hundreds, if not thousands, of gallons of foamy water laced with PFAS entering the environment in many ways including, but not limited to, through surface water and groundwater.

51.     Once PFAS-containing AFFF is applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, it migrates through the environment and into groundwater, surface water, fish, wildlife, and other natural resources. PFAS compounds resist natural degradation and are difficult and costly to remove from soil and water.

52.     In addition to PFAS exposure from drinking contaminated water, humans can be exposed to PFAS through inhalation, ingestion of contaminated food, and dermal contact.

53.     PFAS in Defendants' PFAS-containing AFFF are persistent in the environment and do not readily breakdown, biodegrade, or chemically degrade in the environment. PFAS are soluble in water, are mobile in the environment, and can migrate long distances through soil and groundwater.

54.     Contamination from Defendants' PFAS-containing AFFF presents a threat to public health, to the State's property, and to the State's natural resources.

### History of Defendants' Manufacturing and Selling of PFAS and PFAS-Containing AFFF

55.     PFAS have been used for decades in the manufacturing of AFFF.

56.    In the 1940s, The 3M Company ("3M") began using a process called electrochemical fluorination ("ECF") to create carbon-fluorine bonds, which are key components of PFAS. The ECF process results in a product that contains and/or breaks down into compounds containing PFAS. It was soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled development of many products that resist heat, stains, oil, and water.

57.    In 1951, 3M began selling its PFAS to other chemical companies.

58.    3M exited the AFFF market in the early 2000s.

59.    In the 1960s, certain manufacturers began developing AFFF containing PFAS designed to suppress flammable liquid fires, which cannot be effectively extinguished with water alone. When AFFF concentrate containing PFAS is mixed with water and ejected from a nozzle, it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporative barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

60.    After 3M exited the AFFF market in 2000, Defendants continued to manufacture and sell AFFF and/or PFAS compounds to be used in AFFF.

61.    When 3M phased out production of PFAS, Defendant Historical DuPont began manufacturing its own PFOA chemicals in 2002, despite knowing about the health and environmental risks of its use of PFOA for consumer products starting in 1951. DuPont marketed and sold PFOA to be used in AFFF throughout the United States. DuPont continued to manufacture, market, and sell PFOA until 2013.

62.    In 2015, DuPont transferred its performance chemicals business and some associated liabilities to Defendant Chemours. Defendants Corteva and New DuPont are also DuPont affiliates that manufactured PFOA chemicals and/or have succeeded to Historical DuPont's PFAS liabilities.

63.    At all relevant times, Defendants manufactured, designed, distributed, sold, supplied, transported, arranged for disposal or treatment and/or handled AFFF containing PFAS that was used throughout Colorado causing injury to Colorado's public health, safety, welfare, natural resources, and the environment.

64.     Defendants advertised, offered for sale, sold, and distributed PFAS-containing AFFF products to the military, as well as State government entities, counties, municipalities, local fire departments, and/or other governmental entities and quasi-governmental entities for use in Colorado.

## Defendants Knew or Should have Known That Their PFAS and PFAS-Containing AFFF Products Were Harmful to the Environment and Human Health

65.     Defendants knew for decades that PFAS chemicals were toxic and posed substantial health and environmental risks, but they continued to use PFAS in the manufacture of AFFF, and to promote PFAS for use in AFFF.

66.     Despite its extensive knowledge of the dangers of PFAS, DuPont was a founding member of the Fire Fighting Foam Coalition which was formed to advocate for AFFF's continued viability despite increasing concern around its dangers. Each Defendant had access to information related to the dangers of PFAS compounds used in their AFFF products, but they kept this information hidden from the public as they continued to profit from the sale of AFFF products or PFAS to be used in AFFF.

67.     On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (a) PFAS have negative environmental impacts; and (b) when their PFAS-containing AFFF products are sprayed, used, or otherwise released into the environment per the instructions given by Defendants, PFAS migrate into surface water and through the subsurface, into groundwater; resist natural degradation; can render drinking water unsafe and/or non-potable; and can be removed from water supplies only at substantial expense.

68.     Defendants knew or should have known that AFFF products and PFAS chemicals would very likely injure or threaten public health and the environment. On information and belief, this knowledge was accessible to all Defendants. For example, in 1970, a firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS.

69.     On information and belief, in or about 1977, Tyco/Ansul was aware of the environmental and toxic effects of AFFF. As a result, Tyco/Ansul studied whether it could develop an AFFF that produced less environmental impact.

70.     Defendants knew or should have known that PFAS compounds in their AFFF products easily dissolve in water, because their AFFF products were designed to be mixed with water. Defendants further knew or should have known that PFAS

11

compounds in their AFFF products are mobile, because their products were designed to quickly form a thin film. Defendants knew or should have known that PFAS compounds in their AFFF products resist degradation because of the nature of their products' chemical composition. Defendants knew or should have known that PFAS compounds in their AFFF products tend to bioaccumulate, because information regarding the presence of substances with carbon-fluorine bonds in the blood of the general population was publicly available.

71.     Through their manufacturing, marketing, sale and/or distribution of PFAS-containing AFFF products, and through their involvement and/or participation in the creation of training and instructional materials and activities, Defendants knew, foresaw, and/or should have known and/or foreseen that their PFAS-containing AFFF when used as intended would contaminate the environment.

72.     Defendants knew or should have known, or were or should have been aware, of the federal government investigation commencing in 1998 into PFAS contamination, trade group publications and conferences regarding the dangers of PFAS, and EPA Health Advisories (described in more detail below) advisories regarding the health impacts of exposure to PFAS.

73.     Defendants were or should have been aware, knew or should have known, foresaw or should have foreseen, that their design, manufacture, sale, distribution, release, training of users of, production of instructional materials about, sale and/or use or disposal of PFAS-containing AFFF, including in Colorado, would result in the contamination of the State's property, and contamination of groundwater, surface water, fish, and the State's other natural resources.

74.     As designers, manufacturers, marketers, sellers, and distributors of PFAS-containing AFFF including in Colorado, Defendants were in the best position to reduce the risk of harm of their products.

75.     Defendants failed to disclose the environmental and health risks of their PFAS-containing AFFF that were known or should have been known to them, to the owners or operators of sites, including sites in Colorado, at which AFFF was used, resulting in the release of PFAS into the environment.

76.     Defendants failed to warn public entities or others who used their PFAS-containing AFFF products that use of Defendants' AFFF products would harm the environment and endanger human health.

77.     Defendants also failed to warn public entities or other users of their PFAS-containing AFFF products that their use would result in environmental contamination that would require substantial costs to investigate and clean up and to safely dispose of PFAS-containing AFFF.

78.     Defendants did not act to get their harmful PFAS-containing AFFF products off the market.

79.     The risks associated with the use of PFAS-containing AFFF were generally unknown to the users of AFFF, were unknown to the State, and were generally unknown to those other than Defendants who could have but failed to take steps to reduce or limit the AFFF-related PFAS contamination and injury.

### Federal Government Investigates Ongoing PFAS Contamination From the Use of AFFF

80.     In or around 1998, EPA began investigating safety concerns regarding PFAS after receiving some limited disclosures from PFAS manufacturers about these chemicals.

81.     Given the toxicity of PFAS, eight major PFAS manufacturers agreed in 2006 to participate in the USEPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

82.     Beginning in 2009, EPA issued health advisories about the levels of exposure to PFAS in drinking water that the agency believed were protective of public health. As described on EPA's website, "Health advisories provide information on contaminants that can cause human health effects and are known or anticipated to occur in drinking water. EPA's health advisories are non-enforceable and non-regulatory and provide technical information to state agencies and other public health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination."[1]

83.     In 2016, EPA issued updated drinking water health advisory limits for two PFAS compounds, PFOA and PFOS. The health advisory is intended to provide Americans, including the most sensitive populations, with a margin of protection

---

[1] *Drinking Water Health Advisories for PFOA and PFOS, What's a Health Advisory?*, available at https://www.epa.gov/ground-water-and-drinking-water/drinking-water-health-advisories-pfoa-and-pfos (last visited Dec. 23, 2021).

from a lifetime of exposure to PFOA and PFOS from drinking water. EPA's health advisory level for combined PFOA and PFOS is currently set at 70 parts per trillion.

84.     In November 2021, EPA announced that it asked its Science Advisory Board to review draft scientific documents pertaining to PFOA and PFOS, both of which are linked to widespread drinking water contamination.

85.     The new data and analyses in EPA's draft documents indicate that the levels at which negative health effects could occur for PFOA and PFOS are much lower than previously understood. EPA will be updating their health advisories for PFOA and PFOS to reflect this new science. As outlined in EPA's PFAS Strategic Roadmap, released in October 2021, the agency is developing proposed National Primary Drinking Water Regulations for PFOA and PFOS. EPA expects to issue a proposed rule in Fall 2022 and a final rule in Fall 2023. As EPA undertakes this action, the agency is also evaluating additional PFAS and considering actions to address groups of PFAS.

## Colorado Begins Its Investigation of PFAS Contamination From the Use of AFFF Products in Colorado

86.     The State has begun its investigations and started collecting sampling data to identify and characterize the scope of PFAS contamination in Colorado. The State has incurred and will continue to incur substantial costs in connection with investigating and protecting the public from potential PFAS contamination from AFFF. These investigations are ongoing. As Colorado continues its ongoing investigation of PFAS contamination throughout the State, it continues to discover additional PFAS contamination, including contamination related to the use of PFAS-containing AFFF. The State's regulatory bodies have also taken steps to regulate certain PFAS chemicals under state law.

87.     In 2020, the Colorado General Assembly passed, and the Governor signed into law, legislation known as S.B. 20-218, which created a takeback program for unspent AFFF containing PFAS. This program is administered by the Colorado Department of Public Health and Environment ("CDPHE"). Under the program, CDPHE has arranged for takeback of 9,063 gallons of AFFF to date and expects to take back significantly more as the program continues. CDPHE has not yet identified a safe disposal option for this material and is waiting to arrange for disposal of the AFFF in the program until a safe disposal method is available.

88.     S.B. 20-218 also created the PFAS Cash Fund to help prevent further contamination and reduce exposure from PFAS chemicals. Through this funding,

CDPHE is able to administer the PFAS Grant Program, which includes three categories: sampling, emergency assistance, and infrastructure.

89.     Also in 2020, the Colorado General Assembly passed, and the Governor signed into law, legislation known as H.B. 20-1119. This law created a Certification of Registration Program for entities that use or store AFFF in Colorado. This program allows eligible entities to use and store firefighting foams containing PFAS as long as they have a certificate of registration issued by CDPHE.

90.     As the State's investigation of AFFF-related contamination continues, additional military and industrial facilities, airports, firefighting and training entities, and hazardous waste facilities in Colorado will be uncovered as sites with PFAS contamination resulting from PFAS-containing AFFF, impacting not only the immediate area, but also surrounding areas including the State's property, and the State's groundwater, surface waters, and other natural resources.

91.     Continuing investigation is necessary to ascertain the scope of PFAS contamination resulting from PFAS-containing AFFF and to return the State's impacted property and natural resources to levels that are safe for human health, and to return property and natural resources to their condition prior to contamination from Defendants' PFAS-containing AFFF products. Defendants are liable for the costs of such continued investigation and abatement.

## Colorado's Affected Natural Resources

92.     Wildlife within the State of Colorado is the property of the State. The State, acting through its Division of Parks and Wildlife and Parks and Wildlife Commission, is responsible for protecting, preserving, enhancing, and managing wildlife and their environment within the State.

93.     The State, acting through CDPHE, protects public health and the environment, including drinking water, surface water, groundwater, and land, by implementing and enforcing Colorado and federal statutes and regulations.

94.     In 2020, CDPHE sampled 400 drinking water systems, 15 firefighting districts, 152 groundwater sources, and 71 surface water sources for PFAS.

95.     As part of this sampling, CDPHE tested each sample for 18 PFAS chemicals. The most prevalent chemicals detected were PFOS, PFOA, PFHxS, PFBS, PFHxA, and PFHpA, with detections in greater than 20 percent of the samples. PFNA was detected in more than 10 percent of the samples. PFOS, PFOA, PFHxS, PFHxA, PFHpA, and PFNA are all associated with AFFF.

96.     All of the samples taken from Colorado lakes and rivers had some detectable level of PFAS chemicals.

97.     CDPHE's 2020 sampling program included about half of the community public drinking water systems in the State, which combined serve a total of approximately three-quarters of the State's population. The results of this sampling effort are available in an online dashboard at www.colorado.gov/pacific/cdphe/pfcs, and are summarized in a 2020 PFAS Sampling Effort report by CDPHE.

98.     Thirty-four percent of the drinking water systems that participated in the 2020 sampling program had some level of PFAS chemicals in their drinking water.

99.     Groundwater and surface water sources also tested above the EPA health advisory levels.

100.     All surface waters tested in the 2020 sampling program had detectable levels of PFAS. Four entities that tested source water had sample results that exceeded the EPA health advisory: the Stratmoor Hills Water and Sanitation District, and the Security Water and Sanitation District, both in El Paso County; the Sugarloaf fire district in Boulder County; and the Fourmile Fire District in Teller County.

101.     In 2020, CDPHE also began requiring facilities with discharge-related permits to respond to a survey about the use and storage of certain products containing PFAS chemicals. 193 facilities self-reported a known or suspected presence of PFAS chemicals. 78 facilities reported that they use or store AFFF or class B firefighting foam.

102.     In July 2020, the Colorado Water Quality Control Commission adopted Policy 20-1, "Policy for Interpreting the Narrative Water Quality Standards for Per- and Polyfluoroalkyl Substances (PFAS)" (hereinafter "PFAS Narrative Policy.") The PFAS Narrative Policy interprets provisions in the surface water and groundwater standards for Colorado's state waters that require state surface waters and groundwater to be free of toxic substances. *See* 5 CCR 1002031, Section 31.11(1)(a)(iv) & 5 CCR 1002-41, Section 41.5(A)(1).

103.     Under the PFAS Narrative Policy, the Commission translated the narrative water quality standard into numeric values for a subset of PFAS compounds. The translation levels are chemical specific values that are based on

available toxicity data at the federal level. For PFOA, PFOS, and PFNA, the Commission established a translation level of 70 ng/L that applies to each of these constituents individually and to the sum of the three constituents plus four parent constituents. For PFHxS, the Commission selected a translation level of 700 ng/L, and for PFBS the Commission selected a translation level of 400,000 ng/L.

104.    CDPHE's Water Quality Control Division uses the PFAS Narrative Policy to guide its application of PFAS monitoring requirements and effluent limitations in permits issued under the Colorado Discharge Permitting System. As of September 7, 2021, the Division had required or proposed to require PFAS monitoring in over 30 discharge permits governing discharges from groundwater dewatering operations, domestic wastewater treatment works, an oil refinery, and a landfill.

105.    CDPHE's Hazardous Materials and Waste Management Division requires sampling of two PFAS compounds, PFOA and PFOS, as hazardous constituents at sites that otherwise have a release of a hazardous waste and are undergoing cleanup under the Division's oversight. To date, HMWMD has required PFOA/PFOS sampling at about two dozen sites; PFOA/PFOS at levels above EPA's health advisory level of 70 ppt have been detected at some sites.

106.    Through its sampling efforts, discharge monitoring requirements, and hazardous waste cleanup site sampling requirements, Colorado has identified the presence of PFAS contamination in areas throughout the State. Sampling by other entities has also identified PFAS contamination at multiple locations in Colorado. This includes:

a.  Groundwater, including dozens of drinking water wells in the Colorado municipalities of Security, Widefield and Fountain, downgradient from Peterson Air Force Base, where PFAS-containing AFFF has been used as a fire suppressant, and in groundwater at the United States Air Force Academy, where approximately 75 off-base private drinking water wells are located within 1 mile of the Academy;

b.  Surface waters, including Sand Creek in the metro Denver area and all other surface waters sampled by the State; and

c.  Fish, soils, and sediments.

107. Coloradans have reported significant impacts related to PFAS contamination, including Coloradans residing in the Security, Widefield, and Fountain communities. These Coloradans have reported:

    a. Inability to consume drinking water due to PFAS contamination;

    b. Inability to use well and other water sources for farming, ranching, or other livelihoods;

    c. Injury as a result of receiving and/or consuming water with elevated levels of PFAS; and

    d. Damage to and devaluation of real property due to the presence of PFAS in their homes, soil, surrounding property, and potable water supply.

## **Defendants' PFAS-Containing AFFF Products Have Harmed and Will Continue to Harm Colorado's Property and Natural Resources**

108. AFFF-related PFAS contamination has resulted in contamination of the State's property and the State's natural resources. PFAS is present in groundwater, surface water, soil, fish, and other natural resources in Colorado.

109. Because PFAS are mobile, now that they have been introduced to the State's environment, they will quickly spread because they easily dissolve in water. Thus, PFAS is expected to reach numerous water systems in the State.

110. AFFF-related PFAS contamination will not naturally attenuate. PFAS persist in the environment indefinitely because their multiple fluorine-carbon bonds are exceptionally strong and stable and are resistant to metabolic and environmental degradation processes.

111. PFAS are slowly excreted from individual organisms so ongoing low level exposure results in bioaccumulation, *i.e.*, an increase in the body burden of PFAS in the body. PFAS also biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain.

112. PFAS cause adverse impacts to the environment and to human health.

### Defendants' PFAS-Containing AFFF Products Have Harmed and Will Continue to Harm Colorado Citizens

113.   PFAS are associated with a variety of adverse health effects in humans.

114.   Exposure to certain PFAS is associated with negative health outcomes for humans including, but not limited to, increased risk of ulcerative colitis, increased cholesterol levels, modulation of the immune system, decreasing a woman's ability to get pregnant, increased risks of pregnancy complications, decreased birthweight, and altered growth, learning and behavior of infants and older children, and PFAS may be associated with increased risk of certain cancers.

115.   Coloradans have reported significant impacts related to PFAS contamination, including Coloradans residing in the Security, Widefield, and Fountain communities. These Coloradans have reported:

   a.   Inability to consume drinking water due to PFAS contamination;

   b.   Inability to use well and other water sources for farming, ranching, or other livelihoods;

   c.   Injury as a result of receiving and/or consuming water with elevated levels of PFAS; and

   d.   Damage to and devaluation of real property due to the presence of PFAS in their homes, soil, surrounding property, and potable water supply.

### Historical DuPont's Spinoff of Liabilities to The Chemours Company

116.   In 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS. At the time, it was the largest such penalty in history.

117.   Also in 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million. Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 (*i.e.*, long-chain PFAS) concentrations exceeded

regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community. This panel was known as the C-8 Science Panel.

118.    Eight years later, the C-8 Science Panel found several significant diseases, including cancer, with a probable link to PFOA.

119.    Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia as part of the 2005 settlement and were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).

120.    Chemours—initially called "Performance Operations, LLC"—was organized by Historical DuPont in the State of Delaware on February 18, 2014, for the purpose of transferring to Chemours assets and liabilities, including any entities holding assets and liabilities, associated with certain of Historical DuPont's Performance Chemicals segment. Chemours changed its name to The Chemours Company, LLC on April 15, 2014. The Chemours Company, LLC had nominal operations during the period from February 18, 2014, through December 31, 2014. The Chemours Company, LLC was converted from a limited liability company to a Delaware corporation on April 30, 2015.

121.    In July 2015, Historical DuPont transferred to Chemours its "performance chemicals" business line, including titanium technologies, fluoroproducts (*i.e.,* PFOA)*,* and chemical solutions.

122.    In addition to the transfer of assets, Chemours accepted broad assumption of many liabilities for Historical DuPont's historical use and discharge of PFOA. The specific details regarding the scope and nature of liabilities that Chemours Company assumed are set forth in the non-public schedules.

123.    Historical DuPont's transfer to Chemours of its performance chemicals business line was loaded with failing products and substantial debts, as well as many environmental liabilities from Historical DuPont which were known by Historical DuPont to be extraordinarily large. As a result, Chemours did not receive a reasonably equivalent value in exchange for the transfer of debts and obligations from Historical DuPont.

124.    The assets Historical DuPont transferred to Chemours were unreasonably small in relation to the business or transaction. Historical DuPont knew or reasonably should have known that Chemours would incur massive liabilities and debts beyond its ability to pay them as they became due.

125.    At the time of the transfers from Historical DuPont to Chemours, the performance chemicals business line carried estimated debt and/or liabilities of approximately $4 billion.

126.    In 2015, prices of titanium dioxide plummeted, significantly decreasing the value of Historical DuPont's titanium technologies business line.

127.    Historical DuPont had also promised to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

128.    Under a Separation Agreement, Chemours agreed to indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." The indemnification is uncapped and does not have a survival period.

129.    Chemours agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (a) when or where such liabilities arose; (b) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (c) where or against whom such liabilities are asserted or determined; (d) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (e) which entity is named in any action associated with any liability.

130.    Chemours agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business. Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

131.    Chemours also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

132.    At the time of the July 2015 spin-off, Historical DuPont was aware of its potential liabilities related to PFOA contamination throughout the United States.

133.    Until the spinoff was complete, Chemours was a wholly owned subsidiary of Historical DuPont. Although Chemours had a separate board, the board was controlled by Historical DuPont employees.

134.    Once the spinoff was complete, seven new members of Chemours' Board of Directors were appointed, for an eight-member Board of Directors of the new public company. The negotiations concerning the spinoff were conducted, and the related business decisions were made, while the Board was still controlled by Historical DuPont.

135.    The new independent Chemours' Board that was appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

136.    In a November 2016 SEC filing Chemours stated, "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

137.    Juries in three bellwether trials in the Ohio MDL returned multimillion-dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed that PFOA exposure caused their illnesses.

138.    On February 13, 2017, Historical DuPont and Chemours agreed to pay $671 million to resolve the Ohio MDL.

139.    As part of the settlement, Chemours agreed to pay $25 million for future PFOA costs not covered by the settlement for each of the next five years (up to an additional $125 million).

140.    Historical DuPont also agreed to cover additional amounts up to $25 million for five years.

141.    At the time Historical DuPont transferred its Performance Chemicals Business to Chemours, Historical DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from the release of PFOA and products that contain PFOA including AFFF.

142.    Chemours Company also assumed the obligation to clean-up Pompton Lakes, New Jersey, where Historical DuPont manufactured explosives from 1902 to

1994, and where lead salts, mercury, volatile organic compounds, explosive powders, chlorinated solvents, and detonated blasting caps still contaminate groundwater and soil. Chemours' SEC filings estimate that the remediation, which began in 1985, may cost as much as $119 million to complete.

143.     The creation of Chemours and the above-described corporate machinations to transfer Historical DuPont's liabilities to Chemours was an attempt to segregate and escape from a large portion of Historical DuPont's environmental liabilities, including liabilities related to its PFOA contained in AFFF.

144.     The creation of Chemours was an attempt to limit the availability of funds arising out of—and necessary to pay damages for—Historical DuPont's liability.

## CAUSES OF ACTION

### First Cause of Action – Negligence
(Against all Defendants)

145.     The State realleges and incorporates the allegations set forth in paragraphs 1 through 143 as if fully stated herein.

146.     Defendants owed a duty of care to the State of Colorado and its citizens including, but not limited to, the exercise of reasonable care in the manufacture, marketing, sale, and distribution of PFAS-containing AFFF products in Colorado. Defendants also had a duty to truthfully, and with full disclosure, manufacture, market, sell, and distribute their dangerous products.

147.     Defendants knew or should have known that manufacturing, marketing, distributing, and selling PFAS-containing AFFF created an unreasonable risk of harm to the State and its citizens.

148.     Defendants negligently caused and will continue to cause adverse health effects to Colorado citizens.

149.     Defendants negligently caused contamination of the State's property, and contamination of the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

150.     Defendants breached their duty of care in manufacturing, marketing, selling, and distributing PFAS-containing AFFF for use in the State when

Defendants knew or should have known that use of their AFFF products would result in contamination of the State's property and contamination of the State's drinking water, groundwater, surface water, fish, soil, and sediment and other natural resources, and resulting hazards to human health.

151.    The State has suffered damages and injuries as a result of Defendants' negligence.

152.    The State has suffered and will continue to suffer monetary damages as a result of the need to investigate, manage, and remediate the contamination of Colorado drinking water, groundwater, surface water, fish, soil, and sediment caused by Defendants' PFAS-containing AFFF.  The State has incurred significant financial costs to manage the impacts of such contamination including costs expended to test drinking water, groundwater, surface water, and soil.

## Second Cause of Action – Public Nuisance
### (Against all Defendants)

153.    The State realleges and incorporates the allegations set forth in paragraphs 1 through 151 as if fully stated herein.

154.    The health, safety, and welfare of the citizens of Colorado, including those affected by the contamination of Colorado drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources is a matter of great public interest to the State.

155.    The State was and is entitled to the full use and enjoyment of the natural resources it safeguards and protects for the benefit of its citizens.

156.    In Colorado, public nuisance includes "[a]ny unlawful pollution or contamination of any surface or subsurface waters in this state, or of the air, or any water, substance, or material intended for human consumption." *See, e.g.*, C.R.S. §16-13-305(1)(e).

157.    As described in this Complaint, Defendants have caused a public nuisance that has harmed and will continue to harm the community by manufacturing, marketing, distributing, and selling PFAS-containing AFFF for use in Colorado which has resulted in contamination of the State's property and the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources, and endangered human health.

158.   Defendants' acts and omissions as described in this Complaint have deprived the State and its citizens of the use and enjoyment of the State's natural resources.

159.   Defendants' acts and omissions affect a substantial number of people—the community at large—who use the State's natural resources for commercial, subsistence, passive use, and recreational purposes.

160.   Defendants' acts and omissions interfere with the rights of the State and its citizens to clean and safe natural resources and the environment including, but not limited to, uncontaminated drinking water.

161.   Defendants knew or should have known that their PFAS-containing AFFF would result in substantial damage and injury to Colorado's natural resources and cause substantial public injuries to the State and its citizens.

162.   Defendants knew or should have known that manufacturing, marketing, selling, and distributing their PFAS-containing AFFF for use in Colorado would create an ongoing public nuisance in the State with long lasting effects. PFAS are "forever" chemicals because they persist in the environment for an indefinite (and very long) period of time. PFAS bioaccumulate in the human body and can biomagnify in animals, particularly fish and "top of the food chain" mammals. PFAS exposure is correlated with a wide array of harmful health effects, including kidney and testicular cancer, ulcerative colitis, and adverse effects on the liver, the immune system, the thyroid, cholesterol levels, and fetal development during pregnancy.

163.   The public nuisance created by Defendants' misconduct is substantial and unreasonable. This public nuisance has caused and will continue to cause injury to the State of Colorado and the State's natural resources and has injured or will injure thousands of Colorado' citizens.

164.   The gravity of the environmental and human health risks created by Defendants' PFAS-containing AFFF far outweigh any potentially offsetting benefit.

### Third Cause of Action – Trespass
(Against all Defendants)

165.   The State realleges and incorporates the allegations set forth in paragraphs 1 through 163 as if fully stated herein.

166.   The State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources are the responsibility of the State to safeguard and protect for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

167.   The State owns lands throughout the State. The State brings this claim as the owner of public lands and/or other real property and in its *parens patriae* capacity.

168.   Defendants intentionally and knowingly manufactured, marketed, distributed, and sold PFAS-containing AFFF for transport, storage, use, handling, release, spilling and/or disposal in Colorado.

169.   Defendants' PFAS-containing AFFF has intruded on the public lands and/or other real property owned by the State. Defendants' PFAS-containing AFFF has migrated into and continues to be present in the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

170.   Defendants knew or should have known that their PFAS-containing AFFF products that were transported, stored, used, dispersed, or disposed of in Colorado would intrude on public lands and/or real property owned by the State, and result in contamination of the State's property, and the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

171.   Defendants have trespassed and continue to trespass on the property of the State, and have trespassed on the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

172.   The State did not authorize or permit this invasion of its property and natural resources.

173.   The presence of PFAS in the State's property and in the State's drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources constitutes a continuing trespass, has caused substantial harm to the State and its citizens, and will likely cause further substantial harm.

174.   Defendants' past and continuing trespasses in the State will have long lasting effects.  The PFAS in Defendants AFFF are "forever" chemicals because they persist in the environment for an indefinite (and very long) period of time. PFAS bioaccumulate in the human body and can biomagnify in animals, particularly fish and "top of the food chain" mammals. PFAS exposure is correlated with a wide array of harmful health effects, including kidney and testicular cancer, ulcerative

colitis, and adverse effects on the liver, the immune system, the thyroid, cholesterol levels, and fetal development during pregnancy.

175.     As a direct and proximate result of Defendants' continuing trespass, and the resultant releases of PFAS that trespassed upon the State's property and the State's natural resources, Colorado has suffered and will continue to suffer direct and consequential damages and injuries. Defendants' continuing trespass has endangered and will continue to endanger the health of Colorado citizens.

## Fourth Cause of Action – Unjust Enrichment
(Against All Defendants)

176.     The State realleges and incorporates the allegations set forth in paragraphs 1 through 174 as if fully stated herein.

177.     By common law and the principles of justice, a person or entity may not be inequitably enriched by receiving a benefit at another's expense.

178.     The principles of unjust enrichment are violated where a party steps in to address a duty owed by another to the public to protect the public from an urgent threat to their health, safety, or general welfare and pays expenses that rightfully should have been paid by the other person.

179.     As described herein, Defendants have received a benefit—revenue and profits from the production, sale, and use of AFFF and products that contain AFFF and/or PFAS manufactured by Defendants that have resulted in PFAS contamination in the State of Colorado, without incurring costs for remediation related to pollution from their products.

180.     Defendants' benefit was at the State's expense. To address PFAS contamination in the State in order to protect its residents and natural resources, the State has incurred, and will continue to incur, substantial costs in investigating and responding to PFAS contamination throughout the State of Colorado.

181.     Defendants have been unjustly enriched because they received a benefit from the State's response activities and did not have to incur their own costs to investigate and remediate the PFAS contamination caused by or related to the production, sale, use, and disposal of PFAS, AFFF, and products that contain PFAS, manufactured by Defendants.

182.   The benefit Defendants received is under circumstances that would make it unjust for Defendants to retain the benefit without commensurate compensation.

183.   The principles of justice and established common law require Defendants to reimburse the State for performing a duty properly owed by Defendants as a result of their conduct, as alleged herein.

### Fifth Cause of Action – Violation of the Colorado Uniform Fraudulent Transfer Act
#### (Against Defendants DuPont, Chemours, and Corteva)

184.   Colorado realleges and incorporates the allegations set forth in paragraphs 1 through 182 as if fully stated herein.

185.   Colorado is a "Creditor" holding "Claims" against DuPont as those terms are defined in § 38-8-102 C.R.S.

186.   CUFTA provides at § 38-8-105:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

187.   The "CUFTA Defendants," DuPont, Chemours, and Corteva have: (a) acted with actual intent to hinder, delay, and defraud parties; and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation,

and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

188.   The CUFTA Defendants engaged in acts in furtherance of a scheme to transfer assets of Historical DuPont out of the reach of parties such as the State of Colorado that have been damaged and injured as a result of the CUFTA Defendants' conduct, omissions, and actions described in this Complaint.

189.   It was primarily Historical DuPont—not Chemours, New DuPont, or Corteva—that for decades manufactured, marketed, distributed, sold, released, supplied, transported, arranged for disposal or treatment, handled, and/or used PFAS and/or PFAS-containing AFFF with the superior knowledge that they were toxic, mobile, persistent, bio-accumulative, and biomagnifying, and through normal and foreseen use, would impact the State's citizens, the State's property, and the State's natural resources.

190.   As a result of the transfer of assets and liabilities described in this Complaint, the CUFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution, sale, release, supply, transport, arrangement for disposal or treatment, handling, and/or use of PFAS and/or PFAS-containing AFFF.

191.   At the time of the transfer of its Performance Chemicals business, Historical DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from the manufacturing, marketing, distribution, sale, release, supply, transport, arrangement for disposal or treatment, handling, and/or use of PFAS and/or PFAS-containing AFFF.

192.   The CUFTA Defendants to whom Historical DuPont's performance chemicals line were transferred did not receive reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that Chemours, new DuPont, and Corteva would incur liabilities and debts beyond their ability to pay as they became due.

193.   At all times relevant to this action, the claims, judgments, and potential judgments against Chemours, New DuPont, and Corteva potentially exceeded their ability to pay.

194.   Accordingly, the State is entitled to entry of Judgment under §§ 38-8-108 and 109, C.R.S., avoiding all such transfers, and/or (b) Judgment in an amount necessary to satisfy the State's claims.

## **PRAYER FOR RELIEF**

WHEREFORE, the State of Colorado requests that this Court enter judgments and orders against Defendants, jointly and severally, for all claims alleged in this Complaint as follows:

A.  Judgment for all damages, including economic and non-economic damages, caused by Defendant's negligent conduct which resulted in contamination of the State's property and the State's natural resources;

B.  Judgment for all damages, including economic and non-economic damages, caused by Defendants' trespass of the State's property and the State's natural resources;

C.  An Order requiring Defendants to abate the public nuisance alleged herein;

D.  An Order finding Defendants liable for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to PFAS contamination at and around sites in the State where Defendants' PFAS-containing AFFF was used, handled, released, spilled, transported, stored and/or disposed of so that the State's contaminated property and natural resources are restored to their original condition;

E.  A Judgment in an amount to be determined at trial for restitution, and/or disgorgement, or such orders as may be necessary to completely compensate or restore to the original position any person injured by means of Defendants' tortious conduct;

F.  An Order for all appropriate remedies under §§ 38-8-108 and 109 of CUFTA;

G.  An Order requiring Defendants to pay the costs and expenses of this action incurred by the Attorney General including, but not limited to, the State's attorneys' fees;

H.  An award of pre-judgment and post-judgment interest; and

I. Any further Orders or other relief as the Court deems just and proper.

## JURY DEMAND

THE STATE OF COLORADO DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated this 28th day of February, 2022.

PHILIP J. WEISER
Attorney General


*/s/ Heather Kelly*
PHILIP J. WEISER, Attorney General
AMY BEATIE, Atty Reg. No. 32351*
Deputy Attorney General Natural Resources
   and Environment
LESLIE EATON, Atty Reg. No. 17791*
HEATHER KELLY, Atty Reg. No. 36052*
DAVID KREUTZER, Atty Reg. No.18873*
CARRIE NOTEBOOM, Atty Reg. No. 52910*
First Assistant Attorneys General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone: (720) 508-6000
FAX: (720) 508-6040
*Counsel of Record


**Plaintiff's Address**
1300 Broadway
Denver, CO 80203